UNION OIL COMPANY OF CALIFORNIA, Counterclaim Plaintiff,

v.

ATLANTIC RICHFIELD COMPANY, Chevron U.S.A., Inc., Exxon Corporation, Mobil Oil Corporation, Shell Oil Products Company and Texaco Refining and Marketing, Inc. Defendants.

No. CV–95–2379KMW (JRx).

United States District Court, C.D. California.

Aug. 31, 1998.

---

10. In light of the County's position, the court need not decide this issue.

Barbara A. Reeves, Paul Hastings Janofsky & Walker, Los Angeles, CA, Carleton K. Montgomery, Fried Frank Harris Shriver & Jacobson, Los Angeles, CA, M. Laurence Popofsky, Heller Ehrman White & McAuliffe, San Francisco, CA, John A. Diaz, Harry C. Marcus Bartholomew Verdirame, Michael P. Dougherty, James Gould, Morgan & Finnegan, New York City, John W. Keker, Keker & Van Nest, San Francisco, CA, Richard C. Morse, Richard C. Morse Law Offices, Los Angeles, CA, Jennifer L. Colyer, Fried Frank Harris Shriver & Jacobson, New York City, for Atlantic Richfield Co.

Barbara A. Reeves, Paul Hastings Janofsky & Walker, Los Angeles, CA, Carleton K. Montgomery, Fried Frank Harris Shriver & Jacobson, Los Angeles, CA, Dana Cephas, Kirkland & Ellis, Los Angeles, CA, M. Laurence Popofsky, Heller Ehrman White & McAuliffe, San Francisco, CA, John A. Diaz, Harry C. Marcus Bartholomew Verdirame, Michael P. Dougherty, James Gould, Morgan & Finnegan, New York City, John W. Keker, Keker & Van Nest, San Francisco, CA, Richard C. Morse, Richard C. Morse Law Offices, Los Angeles, CA, Jennifer L. Colyer, Fried Frank Harris Shriver & Jacobson, New York City, for Chevron USA, Inc.

Barbara A. Reeves, Paul Hastings Janofsky & Walker, Los Angeles, CA, Carleton K. Montgomery, Fried Frank Harris Shriver & Jacobson, Los Angeles, CA, Dana Cephas, Kirkland & Ellis, Los Angeles, CA, M. Laurence Popofsky, Heller Ehrman White & McAuliffe, San Francisco, CA, John A. Diaz, Harry C. Marcus Bartholomew Verdirame, Michael P. Dougherty, Arnold I. Rady, James Gould, Morgan & Finnegan, New York City, John W. Keker, Keker & Van Nest, San Francisco, CA, Richard C. Morse, Richard C. Morse Law Offices, Los Angeles, CA, Jennifer L. Colyer, Fried Frank Harris Shriver & Jacobson, New York City, for Exxon Corp., Mobil Oil Corp., Shell Oil Products Co., Texaco Refining and Marketing, Inc.

Laurence H. Pretty, Pretty Schroeder & Poplawski, Los Angeles, CA, Ernest I. Reveal, III, Robins Kaplan Miller & Ciresi, Costa Mesa, CA, Keith A. Newburry, Sheppard Mullin Richter & Hampton, Los Angeles, CA, David W. Beehler, Michael V. Ciresi, Allison A. Johnson, Martin R. Lueck, Linda S. Foreman, Julie L. Levi, David S. Evinger, William M. Lutz, Robins Kaplan Miller & Ciresi, Minneapolis, MN, Arnold I. Rady, Morgan & Finnegan, New York City, for Unocal Corp., Union Oil Co. of California.

PHASE III: MEMORANDUM OF DECISION SETTING FORTH THE COURT'S FACTUAL FINDINGS AND CONCLUSIONS OF LAW

WARDLAW, Circuit Judge.*

The above-entitled action having come on for trial before the Court from December 16, 1997 through December 19, 1997, of the separate and independent affirmative defense of inequitable conduct, and it having been argued and submitted, the Court now renders its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a) in support of judgment for the Plaintiff:

Plaintiff Union Oil Company of California ("Union Oil") is the holder of United States Patent 5,288,393 ("'393 Patent"), dated February 22, 1994. The patent, entitled "Gasoline Fuel", claims compositions producing an unleaded automotive fuel to reduce polluting emissions. In prior phases of this trial, the Court construed the patent (Order dated May 19, 1997), and a jury found that it was valid and infringed by Defendants Atlantic Richfield Company, Chevron USA, Inc., Exxon Corporation, Mobil Oil Corporation, Shell Oil Products Company and Texaco Refining and Marketing, Inc. (collectively "Defendants"). The jury further awarded a reasonable royalty rate for a defined period of infringement. The issue now before the Court is whether Union Oil engaged in inequitable conduct before the Patent and Trademark Office ("PTO") so as to render the '393 Patent unenforceable. For the reasons explained below, the Court has concluded that Union Oil's conduct was not "so culpable that the patent should not be enforced." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995).

**I. STANDARD FOR INEQUITABLE CONDUCT**

■ An applicant for a patent owes a duty of candor and good faith to the PTO. 37 C.F.R. § 1.56. Inequitable conduct may be found when this duty is breached, *Molins PLC*, 48 F.3d at 1178, and, if found in relation to one or more claims,[1] renders the patent unenforceable. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 874 (Fed.Cir.1988) (en banc), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). Inequitable conduct "includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to de-

---

* by designation to the U.S. District Court for the Central District of California

1. The duty of candor extends throughout the patent's entire prosecution history. Therefore, "in determining inequitable conduct a trial court may look beyond the final claims to their antecedents.... [A] breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application." *Fox Industries,*

*Inc. v. Structural Preservation Systems, Inc.*, 922 F.2d 801, 803–04 (Fed.Cir.1990). If prior art is material and withheld from the Patent Office with an intent to deceive, an applicant and his attorney have a duty to disclose the prior art to the PTO notwithstanding that original patent claims have not issued. A fortuitous rejection does not cure a breach of the duty of candor. *Id.* at 804.

ceive." *Molins PLC*, 48 F.3d at 1178. The inventors, the attorney who prepares or prosecutes the application, and all other individuals who are involved in the substantive preparation or prosecution of the application must disclose to the PTO all information known by them to be material to patentability. *Novitas v. The Genlyte Group*, 1995 U.S. Dist. LEXIS 21089, at *43–44 (C.D.Cal. March 9, 1995). The burden of proof as to the materiality of the information, the failure to submit it accurately, and the intent to deceive is clear and convincing evidence. *Id.* at *44–45. Materiality and intent must be proven separately.

**A. Materiality**

In determining the issue of inequitable conduct the Court must first decide whether the applicant withheld information satisfying a threshold level of materiality. Because the '393 patent was pending at the time of the 1992 revision to PTO Rule 56, *Molins PLC*, 48 F.3d at 1179 n. 8, the controlling standard of materiality to patentability is whether the information:

> is not cumulative to information already of record or being made of record in the application, and (1)[i]t establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2)[i]t refutes, or is inconsistent with, a position the applicant takes in: (i)[o]pposing an argument of unpatentability relied on by the Office, or (ii)[a]sserting an argument of patentability.

37 C.F.R. § 1.56 (1992). A patentee "facing a high level of materiality and clear proof that it knew or should have known of that materiality can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed.Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1511, —— L.Ed.2d —— (1998). In other words, given the materiality and failure to offer a good faith explanation of a pattern of nondisclosure, an intent to mislead may be inferred. *Id.* at 1259.

**B. Intent to Deceive**

The requisite intent is to be inferred from all the facts and circumstances. It is found when in light of all the evidence, the conduct indicates "sufficient culpability to require a finding of intent to deceive." *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1189 (Fed.Cir.1993). Intent need not be proven by direct evidence; it "generally must be inferred from the facts and circumstances surrounding the applicant's conduct." *Molins PLC*, 48 F.3d at 1180–81.

> Intent to deceive should be determined in light of the realities of patent practice, and not as a matter of strict liability whatever the nature of the action before the PTO. 'A patentee's oversights are easily magnified out of proportion by one accused of infringement. . . .' Given the case with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required.

*Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed.Cir.1990) (citation omitted).

While intent to deceive the PTO may be found as a matter of inference from circumstantial evidence, circumstantial evidence cannot indicate merely gross negligence. *Molins PLC*, 48 F.3d at 1181 (citing *Kingsdown Medical Consultants*, 863 F.2d at 876 ("[A] finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.")). Thus, the alleged conduct "must not amount merely to the improper performance of, or omission of, an act one ought to have performed. Rather, clear and convincing evidence must prove that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, *viz*, misleading or deceiving the PTO." *Molins PLC*, 48 F.3d at 1181.

An intent to mislead may also be inferred from the affirmative act of submitting misleading information under oath where the examiner has an inability to investigate the facts. *Novitas*, 1995 U.S. Dist.

LEXIS 21089 at *54 (citing *Paragon*, 984 F.2d at 1191).

### 1. Failure to Disclose

In a case involving nondisclosure of information, "clear and convincing evidence must show that the applicant made a deliberate decision to withhold a *known* material reference." *Molins PLC*, 48 F.3d at 1181 (emphasis added). A patentee has no duty to conduct a prior art search, and "thus there is no duty to disclose art of which an applicant could not have been aware." *FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d 521, 526 n. 6 (Fed.Cir.1987). The threshold level of intent in cases alleging failure to disclose known information is high. *See Molins PLC*, 48 F.3d at 1182 ("Things can 'fall through the floorboards' and not arise from an intent to deceive."). It is not enough that applicants or their representatives "should have known of the art or information," actual knowledge is required. *Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 397 (Fed.Cir.1996).

In *Nordberg*, a patentee lost its infringement suit in the district court because its asserted claims were found invalid for obviousness over the prior art, which included the patentee's own patent. The court considered inequitable conduct as relevant to its determination of attorney's fees, and found that the patentee had not engaged in inequitable conduct in failing to disclose even its own patent as prior art, because the patentee's employees were unaware of the existence of the earlier patent during prosecution. The Federal Circuit affirmed, stating:

> Although a copy of the Saunders patent was in [plaintiff's] files, the files contained several hundred patents and there was no showing that any [plaintiff] employee actually searched the files and found a copy of the Saunders patent during the pendency of the '373 patent application.... [S]ince [plaintiff] could not have 'concealed' a prior art reference of which it was unaware, the district court did not clearly err in finding that [plaintiff] did not conceal the Saunders patent with the intent to mislead the PTO.

*Nordberg*, 82 F.3d at 397.

The Federal Circuit explicitly rejected a "should have known" standard for inequitable conduct, holding instead that "the appli-cant's actual knowledge of the reference's existence must be proved." *Id.* at 397. That court noted it had "long ago rejected" the contention that actual knowledge of the art or information was not required, citing *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362 (Fed.Cir. 1984), and explained that neither *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir.1987), nor *Molins PLC*, 48 F.3d at 1178, held to the contrary. In those cases, the Federal Circuit made it clear that in the failure to disclose context the applicant must be chargeable with knowledge of the prior art or information—— it is the materiality of that information which the applicant cannot avoid through studied ignorance. *See e.g., Critikon*, 120 F.3d at 1257; *Novitas*, 1995 U.S. Dist. LEXIS 21089 at * 22. Moreover, the "knowledge" requirement of the PTO's Rule 56, which governs an applicant's duty to disclose, means a present, *conscious* awareness, *i.e.*, "the duty [to disclose] applies to contemporaneously or presently known information." *Duty of Disclosure*, 57 Fed.Reg. 2021, 2025 (1992) (notice of final rulemaking regarding 37 C.F.R. § 1.56).

### 2. Affirmative Misrepresentations

In cases alleging inequitable conduct arising from an affirmative misrepresentation or the submission of false information, a party must prove that (1) the information submitted was material and false and (2) the information was submitted with an intent to deceive. *J.P. Stevens & Co., Inc. v. Lex Tex Inc.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

### C. Balancing

The court's final step in the determination of inequitable conduct is a balancing of the degree of materiality against the degree of the intent to deceive. Once threshold findings of materiality and intent are established, the court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred. *Molins PLC*, 48 F.3d at 1178. This balancing process considers all the evidence, including that of the patentee's good faith. *Id.* at 1181 (in

the context of finding of gross negligence). The final conclusion on the question of inequitable conduct is within a court's equitable discretion. *See e.g., Paragon Podiatry*, 984 F.2d at 1190. In reaching a conclusion on inequitable conduct, the underlying questions, including materiality, knowledge, intent, and good faith, are fact questions for the court to resolve. *Id.; General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1408 (Fed.Cir.1994). "The more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa." *Critikon*, 120 F.3d at 1256.

In this case, Defendants urge the Court to find that Union Oil breached its duty of candor before the PTO both by failing to disclose material information and by submitting affirmatively false information. Specifically, Defendants argue that Union Oil failed to disclose anticipating motor gasolines that it produced commercially at its Los Angeles Refinery ("LAR") and its San Francisco Refinery ("SFR") as well as anticipating motor gasolines commercialized by Defendants ARCO and Chevron. In addition, Defendants assert that the inventors Peter Jessup and Michael Croudace signed and submitted to the PTO false and misleading Rule 131/132 affidavits to establish the conception and reduction to practice of a gasoline fuel prior to an AMOCO motor gasoline that fell within the property limitations of certain claims. The Court will address each of these assertions below.

## II. THE FAILURE TO DISCLOSE ANTICIPATORY MOTOR GASOLINES

Defendants first contend that during prosecution of the '393 patent, the inventors failed to disclose 31 anticipating commercial gasolines described in files possessed by the inventors Jessup and Croudace and Union Oil's chief patent solicitor, Gregory Wirzbicki. Defendants assert that these gasolines would have rendered 62 of the disclaimed claims *prima facie* invalid.[2] These gasolines fall into two groups: (1) motor gasolines produced by Union Oil at LAR and SFR which were shipped for commercial sale; and (2) certain Chevron Super 92 gasolines and an ARCO ECP gasoline, the properties of which were recorded in inventor Croudace's Laboratory Research Record notebook. Union Oil does not dispute that descriptions of those fuels lay within its records during the prosecution nor that it failed to bring them to the attention of the patent examiner. Moreover, there is no question that the inventors Jessup and Croudace were aware of the "duty to disclose to the [Patent] Office information that they are aware of which is material ... includ[ing] prior ... commercial uses ...." Duty of Disclosure, dated December 12, 1990, Ex. 417. Rather, Union Oil contends that with respect to each category, Defendants have not demonstrated with clear and convincing evidence that Union Oil made a deliberate decision to withhold a known material reference.

### A. The LAR and SFR Fuels

During the prosecution of the '393 patent, Union Oil operated refineries at Los Angeles (LAR) and San Francisco (SFR). It is undisputed that none of the 23 individual gasolines produced at LAR and SFR was disclosed to the PTO. Disclosure of internal records from these refineries would have revealed prior art that anticipated certain issued claims of the patent, according to Defendants. Defendants contend as to materiality that such fuels were anticipating commercial gasolines produced by Union Oil itself, and, as to the intent to deceive, that the inventors were aware of these gasolines during the patent prosecution; that Mr. Wirzbicki checked or knew he should have

---

**2.** The '393 patent issued on February 22, 1994, with 224 claims to gasoline compositions, 183 of which claims were disclaimed. The remaining claims, all of which depend from the originally issued claims, number 41 and were the subject of the validity and infringement phases of the trial. There the jury rejected Defendants' arguments that the same fuels at issue here anticipated or rendered obvious the 41 nondisclaimed claims. Thus, in considering anticipatory prior art in this Phase, the Court necessarily must examine such art in relation to issued, but later disclaimed, claims. Trial Transcript at 6407:16–6409:11. The relevant fuels are those identified in the Stipulation Regarding Gasoline Fuels Which Fell Within the Expressly Recited Property Limitations of Claims of the '393 Patent Application and/or Issued Claims of the '393 Patent, filed December 10, 1997, ("Stipulation") Exs. B and D.

checked the LAR–SFR fuel data; and, finally, that Union Oil intentionally misled the PTO by submitting average fuel property values which did not fall within the property ranges claimed in the invention. Defendants have failed to prove by clear and convincing evidence any one of these contentions.

### 1. Materiality

Defendants claim that the gasolines blended at LAR and SFR were "known or used by others in this country" before the invention date and "on sale in this country, more than one year prior to" the U.S. patent application date, and were thus invalidating prior art under 35 U.S.C. § 102(a) and (b).

Union Oil stipulated that 13 of the gasolines produced at its LAR refinery in the years 1988 and 1989 fell within the property limitations of 61 claims that issued as part of the '393 patent.[3] Stipulation ¶¶ 53–66. Although Union Oil did not stipulate with respect to the SFR produced gasolines because no records were maintained as to olefin content, an additional ten gasolines produced at SFR fell within the property limitations of ten issued claims (if the Defendants' calculated olefin content was correct).[4] Thus, Defendants proffer 23 different gasolines produced by Union Oil at LAR and SFR which met the property limitations of a total of 61 claims that issued as part of the '393 patent. Union Oil has admitted that these gasolines also meet the requirements of the preamble of these claims, namely, that they are unleaded gasoline fuels "suitable for combustion in an automotive engine." Ex. 5494 (Unocal Admissions Nos. 529, 530, 630, 631).

Defendants assert that the finished gasolines produced at those refineries were analyzed for their properties and then certified for sale. There is no question that if in fact these gasolines were "on sale" or "in public use" in this country more than one year before December 13, 1990 (the application filing date), or were known or used by others before March 30, 1990 (the invention date), they would have constituted invalidating prior art, and their materiality and required disclosure would have been self-evident. However, Defendants failed to show, by clear and convincing evidence, either factual predicate.

Defendants adduced evidence that the properties of the 13 anticipating LAR gasolines were determined by analyses of samples from Union Oil's Torrance/Lomita Station tank farm downstream from the refinery, from which they were directly sold and shipped to customers. Smith Depo. 64:22–65:10, 65:14–22, 70:13–14, 70:18–20, 90:17–25, 94:17–96:20, 97:2–12, 97:14–22, 94:24, 98:2–19; *Compare* Ex. 691 at U0120350 (Blend No. 219), U0120349 (Blend No. 263), U0120348 (Blend No. 283), U0120341 (Blend No. 36), U0120338

---

**3.** The specific fuels Defendants identify as alleged material fuels from the Los Angeles Refinery are as follows: 1. Unleaded Plus 87 gasoline analyzed July 24, 1989 (Exs. 94 and 676); 2. Unleaded Plus 87 gasoline analyzed August 9, 1989 (Exs. 94 and 676); 3. Unleaded Plus 87 gasoline analyzed August 20, 1989 (Exs. 94 and 676); 4. Unleaded Plus 87 gasoline analyzed October 6, 1989 (Exs. 94 and 676); 5. Unleaded Plus 87 gasoline analyzed March 24, 1989 (Ex. 94); 6. Unleaded Plus 87 gasoline analyzed August 18, 1988 (Ex. 94); 7. Unleaded Plus 87 gasoline analyzed February 4, 1989 (Ex. 94); 8. Unleaded Plus 87 gasoline analyzed August 15, 1989 (Exs. 94 and 676); 9. Unleaded Plus 87 gasoline analyzed August 18, 1989 (Exs. 94 and 676); 10. Unleaded Plus 87 gasoline analyzed October 1, 1989 (Exs. 94 and 676); 11. Unleaded Plus 87 gasoline analyzed July 1, 1988 (Ex. 94); 12. Unleaded Plus 87 gasoline analyzed August 2, 1988 (Ex. 94); and 13. High Performance 92 unleaded gasoline analyzed March 4, 1988 (Ex. 95)

**4.** Defendants represent that the specific SFR gasolines are as follows: 1. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about September 23, 1988; 2. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about September 27, 1988; 3. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about April 12, 1989; 4. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about April 17, 1989; 5. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about April 18, 1989; 6. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about May 1, 1989; 7. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about September 10, 1989; 8. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about October 14, 1989; 9. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about October 17, 1989; and 10. A Unocal San Francisco Refinery unleaded plus 87 gasoline analyzed on or about October 29, 1989.

(Blend No. 86), U0120330 (Blend No. 227), U0120329 (Blend Nos. 241 and 246), U0120328 (Blend Nos. 249 and 252), U0120325 (Blend Nos. 301 and 306), and Ex. 692 at U0119837 (Blend No. 76) *with* Ex. 10,660 "Unocal Torrance/Lomita Station (Tank Farm) Tank Numbers" with letter from Linda S. Foreman to Tony V. Pezzano dated June 24, 1996, attached as Ex. 4 to Defendants' Notice of Lodging of the Rule 30(b)(6) Deposition Testimony of Unocal (Steve Smith Designee). Further, the LAR and SFR Product Reports, which reported the properties of each of the 23 anticipating gasolines, disclose the properties of finished gasolines which were shipped for commercial distribution and eventually sold. Swingle Depo. 21:11–22:20; Vincent Depo. 35:25–36:6, 36:10–37:20, 152:9–11, 152:16–153:3. However, Unocal produced evidence that gasolines prepared at the LAR and SFR refineries were tested as that batch or blend was being produced. Smith Depo. at 53. The test results were reported on confidential, internal documents known as "blend reports". Smith Depo. at 39.

Confidential and internal test results reported on these blend sheets do not make such documents material to patentability. The evidence showed that the blend reports did not necessarily represent the properties of fuel offered for sale. Smith Depo. at 53. Each blend or batch of gasoline was, at that time, transported into further storage tanks that as a regular custom already had a "heel" in it remaining from the prior blend or blends of gasoline. Smith Depo. at 53:20–24. Defendants argue that the on-sale bar does not require an actual sale, citing *American Home Products Corp. v. California Biological Vaccine Labs, 22* U.S.P.Q.2d 1472, 1474, 1991 WL 352417 (C.D.Cal.1991). This argument misses the mark, however, because they still must prove that the gasolines at issue were either known or on sale by clear and convincing evidence. Thus, they failed to meet their burden of showing that confidential documents reflecting analyses of such fuels were material to patentability of any issued claims.

## 2. Intent to Deceive

Defendants assert that the inventors worked with the property data of the LAR–SFR gasolines both as a part of their everyday responsibilities and in connection with specific work leading up to the patent. They also contend that Mr. Wirzbicki, the patent solicitor, checked or knew he should check for the LFR–SFR fuels. Thus they infer from his testimony that good patent practice involves a fundamental inquiry to ascertain whether the applicants' prior commercial products rendered the claims unpatentable. Trial Transcript ("Tr.") at 6520:16–24. Given this knowledge, their argument goes, that the patent solicitor submitted average data for the LAR–SFR fuels, instead of the individual data points for each of the allegedly anticipating fuels, demonstrates that Union Oil intended to deceive the PTO. The defect in Defendants' argument is that they have failed to demonstrate by clear and convincing evidence that any of Croudace, Jessup or Wirzbicki was aware of the individual properties of the LAR–SFR fuels before or during the '393 patent prosecution or that a deliberate decision was made to withhold that information from the PTO.

While there is no question that data existed at Union Oil concerning the SFR–LAR fuels, and that the Fuels Research Group, of which Jessup and Croudace were members, had access to information about those fuels, Defendants did not adduce clear and convincing evidence that either Jessup, Croudace, or Wirzbicki actually knew about the individual properties of the fuels at issue during patent prosecution. All of Defendants' arguments point to the inventors' access to that information and its availability, but none shows the inventors had a present, conscious awareness of material prior art.

The test properties for the identified fuels were reflected in two types of documents. First, the test properties were reflected in the blend reports prepared at the refinery. Second, an employee of Union Oil's Fuels Group, Mr. Gary Phillips, compiled a computer database of historical blends of LAR and SFR fuels.

### (a) The May 14, 1990 Presentation

Defendants assert that the inventors made a presentation to Union Oil management on or about May 14, 1990, and that the presentation materials included certain refinery blend summary sheets. They contend that during the May 14 presentation, Jessup and Croudace discussed the properties of commercial LAR and SFR automotive gasolines produced by Union Oil during the period 1989 to 1990 in light of the one-car test results. Ex. 23 at U0051119–28; Miller Depo. 265:11–13, 445:8–10, 445:13–18, 445:22–25, 446:2–14, 450:5–10, 450:13–18. From this they ask the Court to conclude that either or both Jessup and Croudace reviewed the refinery product blend sheets which disclosed the properties of the LAR and SFR commercial gasolines in preparation for the presentation.

The Court finds that the May 14 presentation by Jessup and Croudace did include a number of charts and graphs which report properties of LAR and SFR gasolines. Ex. 23 at U0051119–28. This evidence demonstrates, however, that their charts and graphs depicted average properties of gasoline pools produced at the LAR refinery and not the properties of any specific batches or blends, other than charts which simply showed the T–50 points, but no other properties of specific internal blends at Union Oil. Ex. 23; Tr. at 470–71.

There was not clear and convincing evidence that either inventor reviewed refinery blend sheets to prepare the summaries for the May 14 presentation. Neither Dr. Jessup nor Dr. Croudace could recall how he obtained the blend properties information for these summaries, but they believed an assistant had gathered the fuel blend data.

### (b) The July 22, 1991 Jessup to Miller Memorandum

In June 1991, a memorandum from Dr. Jessup's superior, Dr. Miller, indicated that at one point Dr. Jessup was asked to conduct a statistical quality control analysis relating to a single gasoline property, Reid Vapor Pressure ("RVP"). Ex. 676. This memorandum identifies the issue of refinery data and "how well the RVP values stood up to a statistical quality control program." It notes that Mr. Phillips had created a spreadsheet of refinery data to be reviewed by Dr. Jessup. Substantial testimony was elicited at trial about the preparation of the resulting July 22, 1991 report, Ex. 1298. A review of the report plainly indicates that the project given to Dr. Jessup was to determine the standard deviation between RVP specifications and actual measurements based on historical data from LAR and SFR blends. As Dr. Jessup wrote, "[h]istorical data from both LAR and SFR for RVP of gasoline blends was examined from a statistical quality control (SQC) point of view." There simply is no evidence that from this project Dr. Jessup became aware of the entire set of fuel properties such that he knew—and purposefully hid from the PTO—the fuel preparation of potentially anticipating fuels.

### (c) Mr. Wirzbicki's Knowledge

Patent counsel Mr. Wirzbicki saw a document reporting average gasoline property values for the LAR and SFR refineries (as well as competitors' gasolines) as reported by the Southwest Research survey while drafting the patent application. The evidence showed that Mr. Wirzbicki used this document to help him understand an appropriate way to draft claims describing the new motor gasolines of the '393 invention. This document and the underlying fuels for the document were disclosed to the examiner through the reporting of various computer searches. Information Disclosure Statement ("IDS") No. 5, dated May 22, 1991. At that time, Mr. Wirzbicki believed he had performed a search of readily available commercial fuels. Defendants urge that Mr. Wirzbicki should have done an additional search of the Phillips data base which would have uncovered the LAR–SFR refinery blend sheet data. There are two problems with this argument, however. First, Mr. Wirzbicki was not legally required to undertake any search. *Nordberg*, 82 F.3d at 397 (citing *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984)). Second, the evidence shows that he was not aware of the Phillips data base until after the issuance of the '393 patent in February 1994. Mr. Wirzbicki then discovered Union Oil's internal blend reports and database and

asked Mr. Phillips to print Exs. 94, 95 and 686, which list the RVP's of the LAR and SFR fuels in descending order. He disclosed this information to the examiner in connection with a later filed patent application, approximately one year before this litigation was commenced by Defendants. Dr. Jessup never saw this data.

### (d) Reporting of Average Data

In IDS No. 2, dated March 7, 1991, the applicants submitted average property data for Unocal's LAR and SFR commercial gasolines which did not meet the requirements of any of the claims of the '393 patent application. Defendants contend that applicants intentionally submitted these averages and misrepresented to the PTO that their source was the SWRI Survey to conceal the individual fuel properties of what applicants must have known was material prior art. This argument fails because there was not clear and convincing evidence that either the inventors or the patent solicitor intentionally misrepresented the internal blend sheet data.

Defendants argue that applicants intentionally altered an internal document by relocating an asterisk in connection with IDS No. 2. On November 16, 1990, less than one month before the filing date of the '393 patent application, Jessup made a presentation to Union Oil management. Miller Depo. 469:14–21, 471:5–472:16, 477:7–9, 477:13–18. This presentation included slides reporting LAR and SFR regular and premium gasoline property data. These slides, which reported average results for RVP, Olefin and T/50 for premium and regular fuel compositions for the 9 RVP Season, contain asterisks by all fuels except Union Oil's LAR and SFR fuels. The asterisks denote "Averages Based on SWRI Survey." Ex. 43. In contrast, the presentation of the same data in IDS No. 2 leads one to believe that the information denoted by the asterisk encompasses all fuels on the presentation because of its placement only once at the top of each page. IDS No. 2 at 94, 95. Defendants assert that the transition of the asterisk demonstrates applicants' intent to deceive the PTO. However, Defendants did not present any evidence as to who

prepared the data presentation, when it was prepared or from which source it was prepared. Thus there is no basis for a finding that presentation of the average data or the transition of the asterik was done with an intent to deceive the PTO. That the presentation was in fact based on the SWRI survey data is supported by the entry for olefins for the SFR refinery—data not maintained by Union Oil, but which was included in the SWRI Survey. Applicants presented to the PTO the existence and scope of the SWRI Survey itself, as well as statistical information derived from the SWRI data base at IDS No. 5. Moreover, the averages reported in IDS No. 2 could not have "come from" the June 26, 1991 Miller memorandum because IDS No. 2 had been submitted almost four months earlier.

### 3. Balancing

Because Defendants failed to make a threshold showing of either materiality or intent to deceive, the Court need not balance the two to determine whether inequitable conduct occurred with respect to the LAR–SFR fuels. Even if the LAR and SFR fuels were found to constitute prior art, however, the Court finds that the paucity of evidence of any intent to deceive would require a finding that applicants did not breach their duties of good faith and candor, especially considering the evidence as a whole and the credibility of Dr. Jessup and Mr. Wirzbicki, whose testimony reflected evidence of their good faith during prosecution of the '393 patent.

### B. The Chevron Super 92 and ARCO EC–P Gasolines

It is undisputed that during the '393 patent prosecution, applicants failed to disclose to the patent examiner the reported properties of one ARCO EC–P gasoline and seven Chevron Super 92 gasolines samples, Stipulation, Ex. B, which had been recorded in a laboratory notebook later signed by Dr. Croudace.[5]

---

**5.** In closing argument, counsel for Defendants confirmed that they did not assert ARCO EC–1 as inequitable conduct. Tr. at 6913:12–13. There-

fore, this analysis is confined to the Chevron and ARCO fuel data set forth in the Croudace notebook.

## 1. Materiality

Defendants contend that as a matter of law, the Chevron Super 92 gasolines, and the ARCO EC–P gasoline which anticipated issued claims, were material prior art and should have been disclosed. They assert these fuels anticipated the claims whose property limitations they met because they were "known or used by others in this country" before any date of invention that Jessup and Croudace can establish for claims requiring at least 92 octane. Jessup and Croudace did not make any such gasoline prior to the filing date of the application, which was December 13, 1990.

Defendants, however, failed to prove by clear and convincing evidence that any cited ARCO or Chevron fuel sample was material. Among other things, every cited Chevron fuel was after the '393 conception date; the cited ARCO fuel was after the '393 conception date. Additionally, each of the ARCO and Chevron fuels represented only a single point of data that was not an enabling disclosure and which, lacking detailed specifications for the claimed properties of the '393 patent, appear to have been at most an accidental or unwitting fuel. See Ex. 13 at p. 132–136. The materiality of these fuels thus turns on the issue of the date of invention. Because the Court finds that Union Oil met its burden under *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1576–77 (Fed.Cir.1996) of establishing a conception date of March 30, 1990, the Court finds the asserted fuels were not material.

## 2. Intent to Deceive

Even if the asserted ARCO and Chevron fuels were material, the Court finds that Defendants failed to demonstrate by clear and convincing evidence that applicants made a deliberate decision to withhold them from the PTO. There was no showing that the applicants were actually aware of the specific fuel properties at issue during the prosecution of the '393 patent. The evidence showed that one of Dr. Croudace's laboratory notebooks, Ex. 32, recorded the data for the Chevron fuels. Persons working under Dr. Croudace's supervision sampled hundreds of fuels and recorded them in his notebooks. The actual notebook at issue here was at all times in the office of and solely used by Mr. Steve Woods. The evidence showed that Dr. Croudace saw this notebook only once when he spent five minutes signing each of the pages of the notebook. He did not read the notebook but turned it over to Mr. Wirzbicki to be returned to the Union Oil library. Tr. at 2251–2254. There was no evidence that Dr. Croudace was ever consciously aware of all of the reported fuel samples' properties; indeed, he testified that he could not so recall. This is not surprising in light of the deposition testimony of Defendants' expert, Joseph Colucci, who admitted that it was not unreasonable for one of ordinary skill in this art not to remember fuel properties even one day after reviewing a list containing such properties. Colucci Dep. at 474–475.

Nor was there any evidence that Dr. Jessup ever saw these laboratory notebooks. These notebooks were maintained at all times by Mr. Woods, a laboratory assistant. He was at most peripherally involved with the patent prosecution [6] and had no basis for knowing the relationship between any of the fuels sampled and the '393 patent. Thus there is no evidence that he acted at any time with an intent to deceive the patent office.

## 3. Balancing

Again, because Defendants failed to make the requisite threshold showing with respect to the competitor's fuels, the Court need not engage in a balancing analysis on this issue.

## III. THE RULE 131/132 AFFIDAVITS

■ In connection with its submission of the statistical information in the SWRI Survey data base in IDS No. 5, Jessup and Croudace, jointly, and Mr. Woods, separately, submitted to the PTO affidavits pursuant to 37 C.F.R. § 1.131 and § 1.132 ("Rule 131/132 affidavits"). The purpose of such affidavits is to establish a date earlier than the application filing date for the purpose of excluding a prior art reference asserted to be antedating of the patent claims. *In re As-*

---

6. The patent solicitor testified that Woods was not substantially involved in the patent prosecution, was never asked to perform any searches for prior art, and was never told by him any information concerning the claim limitations. Tr. at 6660:11–6661:2.

ahi/America, Inc., 68 F.3d 442, 445 (Fed.Cir. 1995); *In re Eickmeyer*, 602 F.2d 974, 978 (Cust.&Pat.App.1979); *In re Moore*, 58 C.C.P.A. 1340, 444 F.2d 572, 574 (Cust.& Pat.App.1971); 1 *Donald S. Chisum, Chisum on Patents* § 3.08[1] (Matthew Bender & Co., Inc.1998). The rule does not require a full-fledged showing of prior invention, *Eickmeyer*, 602 F.2d at 978–79, but only serves to rebut an examiner's *prima facie* finding of obviousness by presenting evidence of secondary considerations or of unexpected superior properties not found in the claimed prior art. 6 *Chisum on Patents* § 19.03[2][d]. In this case, Defendants contend that the Jessup–Croudace Rule 131/132 affidavits affirmatively misled the PTO by describing a fuel identified as 15P2 as being composed of, among other properties, a T50 value of 203F̄.[7] Attached to the affidavit as Exhibit B was a page from Mr. Woods' laboratory notebook which indeed identified the T50 value for a fuel identified as 15P2 as 203F̄. Ex. 13 at p. 189. The affidavits did not disclose that two other fuels independently blended on the same day to the same recipe using the same blending stocks had T50 values of 204F̄.

Defendants assert that the circumstances surrounding the preparation and testing of fuel 15P2 either support a finding of an affirmative misrepresentation or a failure to disclose material information which rendered the affidavits misleading. It is undisputed that fuel 15P2 was hand blended at the same time two other barrels of fuel were blended and labeled 15P1 and 15P3. Tr. at 477–485. These three barrels of fuel were blended using the same recipe. *Id.* Because of state limitations on blending volumes, the larger batches of fuel were blended simultaneously in three separate drums. Woods Depo. at 136:24–138:19. The evidence is also clear that each barrel of fuel was independently blended, meaning that the ingredients for each barrel were individually measured into each individual barrel separately, as opposed to one single large batch of fuel being blended in a single large container and then divided and poured into three separate containers. Tr. at 477:15–483:24. It was further demonstrated that although the barrels were blended using the same recipe, the measurements of each component of the blend were not and could not be exact, thus resulting in variances and differences among the properties of each batch or barrel of fuel. *Id.* In fact the T50 values for each of 15P1 and 15P3 were 204F̄, as reflected in Ex. B to the affidavits. It was also undisputed that Union Oil presented the average fuel properties for the test fuel designated "P" in Table 5 of the patent, averaging the T50s of 15P1, 15P2 and 15P3 to 204F̄.

## A. Materiality

Information presented to a patent examiner in an affidavit required by 37 C.F.R. § 1.131 may be "inherently material." *Refac Int'l., Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed.Cir.1996). Where a false affidavit is submitted "to overcome the rejection of a patent application, materiality is presumed." *Procter & Gamble Co. v. Kimberly–Clark Corp.*, 740 F.Supp. 1177, 1197 (D.S.C.1989), *aff'd*, 907 F.2d 159 (Fed.Cir.1990); *see also Donaldson Co., Inc. v. Pneumafil Corp.*, 617 F.Supp. 1428, 1441 (W.D.N.C.1985), *aff'd in relevant part*, 824 F.2d 979 (Fed.Cir.1987).

In this case, the Court finds that the information set forth in the Rule 131/132 affidavits was truthful, and, therefore, materiality is not presumed. In identifying the T50 value of 203F̄ for fuel 15P2, the applicants accurately represented that value for a fuel that constituted a separate reduction to practice from the other "P" fuels. The other two fuels and their properties were actually disclosed to the PTO in Exhibit B to the affidavits. That the ASTM test that was used had a repeatability range of greater than 1ˉis irrelevant. There is no dispute that utilizing the particular test that had been specified in the patent and explained to the PTO "one such fuel identified as 15P2" in fact had a D–86 distillation point of 203F̄.

Defendants next urge that the circumstances of the blending of the three fuels, together with the fact that the average T50

---

**7.** More precisely the affidavit reads "50% D–86 distillation point of 203F̄." Ex. 13 at p. 187. What this signifies is the temperature at which 50% of the fuel will turn to vapor. The patent application explained that reference to the "D–86 Distillation Point" refers to the point obtained by using a specific testing procedure identified as ASTM D 86–82. Ex. 13 at p. 45.

value for the fuels was stated as 204°F in Table 5, should have been disclosed to the patent examiner so as to render the affidavit not materially misleading.

Again, the evidence showed that each barrel was a separate drum or barrel of fuel, and that the T50 was measured for each individual drum because each drum was different and distinct. Fuel 15P2 was a separate reduction to practice, and it was irrelevant whether other separate reductions to practice of other fuels contained different values for various properties. Ample evidence throughout the trial demonstrated that fuels blended even to the same specifications, when measured, would result in varying values for T50 and other properties. That does not render the measurement for each individual fuel invalid.

Defendants further contend that applicants should have provided the average data for the fuels, 15P1, 15P2 and 15P3, as they did in Table 5. However, the evidence shows that averaging the analyses of these fuels may not have been proper for submission to the PTO in this context because it is not an actual measurement value of a single reduction to practice. The PTO has recognized that submission of averages in reporting test results, which may be appropriate for some purposes, may actually be misleading for other purposes. The Reply to Comment 21 in 57 Fed.Reg.2021 addresses the use of averages in test data:

> Whether test results can be submitted as average rather that individual test runs depends on whether doing so would provide the Office the information needed to make a proper determination of patentability.... In some cases, providing averages might be misleading, but in other cases providing averages might be appropriate.

57 Fed.Reg. at 2025. Nowhere is it suggested that submission of the actual values, especially to demonstrate a reduction to practice, could ever be misleading.

Union Oil's presentation of the average properties of fuels 15P1, 15P2 and 15P3 in Table 5, on the other hand, was plainly made for the purpose of demonstrating the results of its experiments and analysis on the nature of emissions generated by specific fuels. Use of the average of the three fuels was appropriate for this purpose. Analysis showed that the three fuels were similar enough in properties that when run through an engine the slight differences in fuel properties would not have any meaningful impact on the equations ultimately generated from the experiment. Tr. at 6812:12–22 (testimony of Dr. Jessup). Because averaging the data was appropriate for one purpose— testing— does not mean that the use of actual data was inappropriate for establishing an earlier embodiment of the patented fuel.

### B. Intent to Deceive

Defendants failed to adduce clear and convincing evidence that the Rule 131/32 affidavits were submitted with the intent to mislead the PTO. Defendants contend that the exclusive purpose of the Rule 131/32 affidavits was to establish a fuel antedating an AMOCO gasoline which would otherwise be invalidating prior art as to Application Claim 89. A review of IDS No. 5, as well as the accompanying affidavits and exhibits, however, plainly shows that these materials were submitted because Union Oil's patent attorney had become aware of the SWRI computerized database containing compositional data dating back to 1981 on over 45,000 gasoline samples taken from storage tanks of service stations throughout the United States. Ex. 13 at p. 126–127. The SWRI database was a confidential database, available only to paying subscriber refining companies, who had agreed to confidentiality provisions precluding disclosure. *Id.* Upon discovering that Union Oil had a searchable copy of this database, Mr. Wirzbicki directed that the data be analyzed. He provided the results of that search to the PTO through IDS No. 5, explaining that due to confidentiality agreements, the specific data could not be disclosed, but that statistical information could be reported. Ex. 13 at pp. 126–131.

In effect IDS No. 5 was a voluntary disclosure that many fuel samples had composition properties falling within the property limits of over 20 claims set forth in the patent application. IDS No. 5 indicates that it and the affidavits were submitted because Union Oil had "recently become aware" of the SWRI database and had run broad computer

searches of it, not specifically to establish a date of invention before the date of the AMOCO sample. By providing the two reduction to practice dates (February 1990; June 1990), and by referencing those dates to specific claims in the application, the affidavits reduced the number of database samples from this enormous database that would fall within claims then pending which might require a further inquiry. In Table A of IDS No. 5, the applicants provided a claim-by-claim listing of how many aggregate samples had compositional data falling within each claim, and then referenced the February 1990 or June 1990 dates next to each claim. It was explained that when these dates were referenced, the applicants believed "that the accompanying 131–132 affidavits establish a date for their invention of claim X [the referenced claim] at least by the end of [the listed dates from the affidavit], and that no samples within the scope of the claims existed prior to that date." Ex. 13 at p. 130. Table A shows many claims, in addition to claim 89, referenced to either the February 1990 or June 1990 dates set forth as reductions to practice for purposes of the 131/132 affidavits. Ex. 13 at pp. 126–132.

IDS No. 5 itself shows Mr. Wirzbicki made his disclosure of and arguments about the database preliminary to and in advance of any discussion of the affidavits and their effect. Among other things, Mr. Wirzbicki cited the statistically trivial number of data points which fell within the scope of any given claim prior to the effective date as evidence that these very few samples represented an accidental, unintended, or unwittingly produced fuel. Ex. 13 at p. 132.[8] The broad disclosures in IDS No. 5 undercut Defendants' assertion that the particular fuel description in the Rule 131/132 affidavits was for the purpose of deceiving the PTO. As to the intent behind the disclosure of the T50 value for fuel 15P2 alone, the testimony of the Union Oil witnesses demonstrates they believed the three fuels labeled 15P1, 15P2

and 15P3 were distinct and separate blends of fuel. Tr. at 477:15–483:24; Croudace Depo. 1828:21–1830:22; 1835:9–1849:21. In addition, that the inventors and patent counsel believed that the separate fuels were separate reductions to practice is further demonstrated at Ex. 13 at p. 252 (footnote) where the examiner's attention is drawn to the separate sample Fuel 15P1 of the affidavit. Croudace testified that they were not the same fuel and that Wirzbicki knew that. Croudace Depo. 1664:10–13.

Moreover, the evidence showed that Dr. Jessup and Dr. Croudace understood that all that was needed to be established for the truthful signing of the affidavit was that the referenced fuels had to have actually been made. Croudace Depo. at 1541:24–1545:4; 1545:20–1547:24. As Croudace testified, when he signed the affidavit he meant that he "produced a fuel with the properties stated prior to that date." Croudace Depo. 1545:12–13.

Therefore this Court concludes that Defendants have failed to prove that the applicants or their patent counsel had an intent to deceive the PTO with regard to the Rule $131/132$ affidavits disclosing fuel 15P2.

## C. Balancing

Defendants have failed to meet their burden of establishing threshold levels of materiality and intent to deceive with respect to the Rule $131/132$ affidavits, and thus the Court need not engage in a balancing analysis on this issue. Placed in context, however, given the evidence of Union Oil's good faith surrounding the submission of the SWRI database to the PTO, and the subsequent narrowing and abandonment of numerous of its claims, this Court, considering all the evidence, cannot find that Union Oil acted with the intent to deceive the PTO with respect to the one application claim at issue here.

---

8. The examiner issued a November 12, 1991 office action that rejected all claims of the '393 patent application. These rejections were not based on any prior art status of the SWRI database; instead, the examiner's objections were based on 35 U.S.C. § 103 obviousness grounds arising from the Burns and Nagasawa references. As to the SWRI database, the examiner gave no prior art rejection over this database, and questioned whether this database could provide any valid basis for a rejection. The examiner expressly questioned its public status: "it is not clear how accessible the Data was to be [to] the public (*i.e.*, oil companies in general). The small companies in general [sic]." Ex. 13 at pp. 197–200.

## IV. EVIDENCE OF GOOD FAITH

Defendants urge that the Court find that the entire prosecution history manifested an intent to deceive when one examines the massive amount of data disclosed in juxtaposition to the small items of assertedly more critical data withheld. Carried to its logical extreme, this argument would have a chilling effect on patent prosecutions. Especially in view of the prosecution of this case, during which the applicants performed four prior art searches and provided all the data of which they were aware to the PTO, *see* Croudace Depo. 1654:6–1659:16; 1660:19–24, including information as to fuels later asserted as prior art in this litigation, a ruling that this only evidences their bad faith due to the failure to present a small sampling of additional fuels might very well cause the next applicant to think twice before providing so much information to the patent examiner. Able defense counsel, such as those now before the Court, would only be further encouraged in their "habit of charging inequitable conduct in every major patent case," which the Federal Circuit warned a decade ago "has become an absolute plague." *Burlington Industries, Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed.Cir.1988).

This Court finds to the contrary. The record reveals numerous examples of Union Oil's good faith, including disclosure and analysis of a large database of fuels (Ex. 13 at Tab 10, Tab 20); numerous publications turned into the examiner (Ex. 13 at Tab 5, Tab 18); continued searching after the application was filed (Ex. 13 at Tab 11); continued review for mistakes or to provide further information (Ex. 13 at pp. 298, 331, 356); voluntarily giving up claims by amending without rejection and, indeed, after allowances (Ex. 13 at Tab 20, Tab 29) and discussion of cited references (Ex. 13 at Tabs 18 and 19).

In addition, the evidence also demonstrates that the '393 inventors and their patent counsel made ongoing disclosures to the same patent examiner during prosecution of a sibling patent application on a related subject matter, which has since issued as U.S. Patent No. 5,593,567, of information that Defendants in this litigation allege was withheld or misrepresented during the prosecution leading to the parent '393 patent. This also included disclosure of additional references that Defendants allege would have anticipated or rendered obvious the subject matter of the '393 patent. Disclosing information to an examiner during prosecution of a related "sibling" application, as the '393 applicants and their patent counsel did during prosecution of a divisional application (now issued as U.S. Patent No. 5,593,567) covering related subject matter, does not reflect conduct "consistent with an intent to deceive." *Kimberly–Clark Corp. v. Procter & Gamble Dist. Co.*, 973 F.2d 911, 918 (Fed.Cir.1992).

## V. CONCLUSION

Considering the evidence as a whole, including the ample evidence of good faith in contrast to the lack of evidence of intentional deception, the Court finds the Defendants have not proved by clear and convincing evidence that any inequitable conduct occurred in the filing or prosecution of the patent application that led to the '393 Patent. Judgment shall be entered accordingly.